**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 06-cr-466** |
| | : | |
| **STOLT-NIELSEN S.A., <u>et al.</u>** | : | |

<u>**MEMORANDUM AND ORDER**</u>

Kauffman, J.                                                                November 29, 2007

On September 6, 2006, a federal grand jury sitting in the Eastern District of Pennsylvania

returned an indictment charging Stolt-Nielsen, S.A. ("SNSA"), the Stolt Nielsen Transportation

Group, Samuel A. Cooperman ("Cooperman"), and Richard B. Wingfield ("Wingfield")

(together, "Defendants") with violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Now

before the Court are Defendants' Motions to Dismiss the Indictment.  For the reasons that follow,

the Motions will be granted.

**I.      BACKGROUND**

In August 1993, the Antitrust Division of the United States Department of Justice (the

"Division") instituted a new Corporate Leniency Program designed to provide an opportunity and

incentive for companies to self-report activity that violates the criminal antitrust laws.  Under the

Corporate Leniency Program, the first company to report its illegal antitrust activity to the

Division is immunized from prosecution provided it meets the Program's conditions.  <u>See</u>

Findings of Fact ("FOF") ¶¶ 107-110.  This criminal matter arises from Defendants' participation

in the Corporate Leniency Program and the Division's revocation of their immunity.

In 1998, the Stolt-Nielsen Transportation Group ("Stolt-Nielsen"), a Luxembourg parcel

tanker shipping company, entered into a customer allocation conspiracy with two of its primary competitors, Odfjell Seachem AS ("Odfjell"), a Norwegian shipping company, and Jo Tankers B.V. ("Jo Tankers"), a Dutch shipping company.  As part of the agreement, Stolt-Nielsen and its co-conspirators would refrain from bidding or competing for customers on deep-sea trade routes allocated to the other party.  FOF ¶¶ 5-7.  While Stolt-Nielsen's agreement with Odfjell was formalized through the exchange of customer lists, its arrangement with Jo Tankers was *ad hoc*. See FOF ¶¶ 6-7.  Both agreements constituted *per se* violations of Section 1 of the Sherman Act. See 15 U.S.C. § 1.

Prior to 2001, Andrew Pickering ("Pickering"), who at the time managed Stolt-Nielsen's Tanker Trading division, was responsible for implementing the agreement with Odfjell and Jo Tankers with the active participation of Stolt-Nielsen's business directors and other employees. At that time, employees of Stolt-Nielsen and Odfjell engaged in frequent anticompetitive communications.  In February 2001, Wingfield replaced Pickering as Managing Director for Tanker Trading, and assumed primary responsibility for the customer allocation conspiracy.  See FOF ¶¶ 9-11.

In early 2002, Paul O'Brien ("O'Brien"), then Senior Vice-President and General Counsel of Stolt-Nielsen, found a copy of an April 10, 2001 memorandum from Bjorn Jansen ("Jansen"), Business Director of Stolt-Nielsen's Pacific Ocean Services, to Wingfield, his immediate superior, which had been left anonymously on his desk.  The memo weighed the advantages and disadvantages of competing with Odfjell and concluded that "continued coop is preferable." Upon reading the memo, O'Brien became concerned about antitrust compliance at Stolt-Nielsen, and reported his concerns to the Chairman, Cooperman.  See FOF ¶¶ 12-13.  O'Brien

2

subsequently resigned from Stolt-Nielsen on March 1, 2002.  In June 2002, he filed a constructive-discharge lawsuit against Stolt-Nielsen and Cooperman, alleging "ongoing criminal conduct" in violation of the antitrust laws.  See FOF ¶ 14.

Beginning in late February 2002, in prompt response to the concerns raised by O'Brien, Stolt-Nielsen, under the leadership of Cooperman and CEO Reginald Lee ("Lee"), took action to terminate the anticompetitive conduct that O'Brien reported.  Stolt-Nielsen instituted a comprehensive and revised antitrust policy ("Antitrust Compliance Policy") memorialized in a revised Handbook which expressly prohibited collusive contacts with competitors.  In early March 2002, Cooperman and Lee met with Wingfield, provided him with the Handbook, and ordered him to distribute copies not only to Stolt-Nielsen employees, but to competitors as well.  Wingfield committed to adhere strictly to the new policy.  Cooperman met individually with each Business Director and unequivocally stated that all collusive activity must cease immediately and that there would be severe consequences for non-compliance.  In late March and April 2002, Stolt-Nielsen held a series of mandatory seminars around the world designed to inform its employees about the Antitrust Compliance Policy.  The employees were required to sign certifications in which they represented that they would comply strictly with the Antitrust Compliance Policy.  See FOF ¶¶ 18-31.

The Antitrust Compliance Policy was effective in transforming Stolt-Nielsen's corporate culture and reforming its business practices.  It drastically altered the nature of Stolt-Nielsen's contacts with its competitors.  While competitors continued to initiate collusive contacts, Stolt-Nielsen employees repeatedly refused to engage in anticompetitive discussions with them, and reported any such contacts to their superiors in compliance with the Antitrust Compliance Policy.

FOF ¶¶ 32-33.  Starting in March 2002, Stolt-Nielsen began competing vigorously with Odfjell and Jo Tankers for contracts that previously had been subject to collusion, and succeeded in winning a number of them.  See FOF ¶¶ 37-39.

In mid-November 2002, Cooperman retained John Nannes ("Nannes"), former Deputy Assistant Attorney General for the Division and a partner at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, to conduct an independent investigation and to explore the possibility of Stolt-Nielsen's participation in the Division's Corporate Leniency Program.  See FOF ¶¶ 103, 106.  During a meeting with Cooperman, Nannes learned that O'Brien had raised antitrust concerns in February 2002.  Nannes could not conclude from the face of the memorandum that aroused O'Brien's concern whether it reflected a collusive agreement or conscious parallelism, a lawful decision not to compete for another company's customers.  See FOF ¶¶ 105.

In late November 2002, after receiving authorization from Cooperman, Nannes contacted the Division to inquire whether it had begun investigating the parcel tanker shipping industry. Nannes learned that although the Division had initiated an investigation in response to a November 22, 2002 *Wall Street Journal* article reporting O'Brien's lawsuit, it had not yet granted immunity to any parcel tanker shipping company.  On December 4, 2002, Nannes met with Deputy Assistant Attorney General James A. Griffin ("Griffin") and discussed the antitrust concerns raised by O'Brien and the possibility of Stolt-Nielsen's acceptance into the Corporate Leniency Program.  Griffin stated that if O'Brien had been fired for exposing actual antitrust violations, Stolt-Nielsen would not be eligible for leniency.  Nannes responded that O'Brien had not been fired but left voluntarily, and that, in any event, the circumstances of his departure were irrelevant because the company had taken prompt remedial steps in response to his concerns by

4

instituting a comprehensive Antitrust Compliance Program.  Griffin has acknowledged that Nannes never represented that Stolt-Nielsen's participation in the illegal activity had terminated in March 2002.  See FOF ¶¶ 113-115, 117.

On December 17, 2002, Griffin informed Nannes that the Division had conducted a sufficient investigation to be comfortable going forward and that Stolt-Nielsen was being given a "marker."[1]  Upon receiving the marker, Nannes began an independent investigation and interviewed numerous Stolt-Nielsen employees, including Wingfield.  See FOF ¶¶ 121-125. Wingfield explained the operation of the customer allocation conspiracy with Odfjell and Jo Tankers and provided Nannes with his personal journals and lists identifying customers allocated under the conspiracy.  In response to Nannes' request, Wingfield searched for a "combined" customer allocation list, which he eventually located with Pickering's assistance.  Wingfield provided the combined list to Nannes, who considered it to be strong evidence of a *per se* antitrust violation.  See FOF ¶¶ 125-129.

On January 8, 2003, Nannes made a proffer at the Division's Philadelphia Office based on information he was provided by Wingfield and other Stolt-Nielsen employees.  As part of the proffer, Nannes described the customer allocation conspiracy between Stolt-Nielsen and its competitors, and indicated that he had obtained copies of some of the customer allocation lists. At no time did Nannes represent when Stolt-Nielsen's participation in the conspiracy had ended, nor was he ever asked to do so.  FOF ¶¶ 131-132.[2]

---

[1]      Receipt of a "marker" secures an applicant's first place in line for the Corporate Leniency Program.  FOF ¶ 119.

[2]      The Division was aware that the individuals who had provided information that went into Nannes' proffer were still employed by Stolt-Nielsen, but did not state that Stolt-Nielsen was ineligible

On January 15, 2003, the Division and Stolt-Nielsen entered into a Conditional Leniency Agreement ("the Agreement") *drafted by the Division*.[3]  As part of the Agreement, Stolt-Nielsen represented that it "took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity." FOF ¶¶ 135-139.[4]  Stolt-Nielsen further agreed "to provide full, continuing and complete cooperation to the Antitrust Division in connection with the activity being reported."  FOF ¶ 150.  This cooperation included: providing the Division "full exposition of all facts known to [Stolt-Nielsen]" regarding the activity being reported; providing all documents requested by the Division; "using its best efforts to secure" the full cooperation of its officers, directors, and employees; facilitating these employees' appearance at interviews or to give testimony as requested by the Division; and making reasonable efforts to pay restitution to any injured parties.  Id. When it drafted the Agreement, the Division was aware of the allegations in O'Brien's original and amended complaints, copies of which it had obtained previously.  See FOF ¶ 112.

In exchange for the self-incriminating cooperation of Stolt-Nielsen and its directors, officers, and employees, the Division made the express promise "not to bring any criminal prosecution against [Stolt-Nielsen] for any act or offense it may have committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported." FOF ¶ 146; Conclusions of Law ("COL") ¶ 16.  Moreover, Paragraph 4 of the Agreement

---

for leniency because it had not terminated employees previously involved in antitrust violations.  See FOF ¶ 134.

[3]      The Agreement expressly preserved Stolt-Nielsen's attorney-client and attorney work-product privileges.  See FOF ¶ 148.

[4]      The Agreement did not contain a date of discovery.  See FOF ¶ 142.

provides conditional leniency for directors, officers and employees of Stolt-Nielsen "who truthfully cooperate with the Division," and expressly states that such employees "shall not be prosecuted criminally by the Antitrust Division for any act or offense committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported." See FOF ¶ 151.[5]  The Division reserved the right to verify Stolt-Nielsen's representations.  See COL ¶ 17.

Beginning in November 2002, Stolt-Nielsen and its employees provided the Division with volumes of highly incriminating evidence revealing their roles in the customer allocation conspiracy.  See FOF ¶¶ 162-163, 167-168.  Based upon this information, the Division successfully prosecuted Odfjell and Jo Tankers: Odfjell was fined $42.5 million, and its executives Bjorn Sjaastad ("Sjaastad") and Erik Nilsen ("Nilsen") both served prison terms and were personally fined.  Jo Tankers was fined $19.5 million, and its former co-managing director, Hendrikus Van Westenbrugge ("Van Westenbrugge"), also served a prison term and paid a fine.

---

[5]     The preamble to the Agreement distinguishes between the corporate parties and the directors, officers and employees.  The only obligations imposed by the Agreement upon Stolt-Nielsen's directors, officers and employees are set forth in Paragraph 4.  They apply prospectively, and consist of the following:

(a)     producing ... all documents and records, including personal documents and records ... requested by attorneys and agents of the United States;

(b)     making himself ... available for interviews ... upon the request of attorneys and agents of the United States;

(c)     responding fully and truthfully to all inquiries of the United States ... ;

(d)     Otherwise voluntarily providing the United States with any materials or information, not requested in (a)–(c) of this paragraph, that he or she may have relevant to the anticompetitive activity being reported; and

(e)     when called upon to do so by the United States, testifying in trial and grand jury or other proceedings ... fully, truthfully and under oath ...

FOF ¶ 152.

<u>See</u> FOF ¶¶ 173-175.  Without Stolt-Nielsen's cooperation, the Division did not have sufficient

evidence to sustain a conviction of any company in the parcel tanker industry.  <u>See</u> FOF ¶ 176.

On April 8, 2003, the Division notified Stolt-Nielsen that it had obtained evidence that

Stolt-Nielsen "did not terminate its part in the illegal activities in or about March 2002,"

"continued its activities until at least as late as the second half of 2002," and thus had not met the

conditions for leniency set forth in the Agreement.  FOF ¶ 177.[6]  Without ever speaking either to

Wingfield or to Cooperman, the Division suspended Stolt-Nielsen's obligation to cooperate

under the Agreement pending further investigation.[7]  On June 24, 2003, Wingfield was arrested,

and a formal revocation of Stolt-Nielsen's leniency followed on March 2, 2004.  Neither Stolt-

Nielsen nor its executives were given an opportunity to respond to the allegations.  Neither

Cooperman nor Wingfield refused to cooperate with the Division at any time.  <u>See</u> FOF ¶¶ 177,

180-183.

In February 2004, Stolt-Nielsen and Wingfield commenced a civil action in this District

for declaratory and injunctive relief seeking to bar the Division from prosecuting the company

and its executives.[8]  FOF ¶ 184.  The Honorable Timothy J. Savage held an evidentiary hearing

---

[6]    The Agreement is devoid of any mention of a March date.  The only date specifically
referenced in the Agreement is January 15, 2003.  FOF ¶¶ 142, 144.  Moreover, Paragraph 5 of the
Agreement contains an integration clause stating that "[t]his letter constitutes the entire agreement
between the Antitrust Division and [Stolt-Nielsen], and supersedes all prior understandings, if any,
whether oral or written, relating to the subject matter herein."  FOF ¶ 147; COL ¶ 14; <u>see</u> <u>In re Altro</u>,180
F.3d 372, 375 (2d Cir. 1999).

[7]    When it issued its April 8, 2003 suspension letter, the Division had not yet interviewed
<u>any</u> Odfjell employees.  The only co-conspirator with whom it had spoken was Hugo Finlay of Jo
Tankers.  FOF ¶ 178.

[8]    Cooperman did not participate in the civil proceedings, as the Division failed to advise
him that he was a target of its investigation until March 27, 2006.  <u>See</u> FOF ¶ 185.

on April 13 and 14, 2004, during which Nannes and Griffin testified.  On January 14, 2005, Judge Savage issued findings of fact and a memorandum opinion which concluded that Stolt-Nielsen had not breached the Agreement and enjoined the Division from revoking Stolt-Nielsen's conditional leniency.  Stolt-Nielsen S.A. v. United States, 352 F. Supp. 2d 553 (E.D. Pa. 2005); see also FOF ¶¶ 184-186.

The Third Circuit reversed on the ground that the principle of separation of powers precluded the Court from enjoining the Government from indicting Stolt-Nielsen.  Stolt-Nielsen S.A. v. United States, 442 F.3d 177 (3d Cir. 2006).  Without reaching the merits of the case, the Third Circuit instructed that if Stolt-Nielsen were to assert the Agreement as a defense after indictment, the reviewing court must (1) consider the Agreement "anew;" (2) determine the date upon which Stolt-Nielsen "discovered" the anticompetitive activity it reported; (3) consider Stolt-Nielsen's and Wingfield's "subsequent actions;" and (4) determine whether Stolt-Nielsen fulfilled its obligation to take "prompt and effective action to terminate its part in the anticompetitive activity being reported."  Id. at 187 n.7; see FOF ¶¶ 187-188.

On September 6, 2006, Defendants were indicted for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  On November 22, 2006, they moved to dismiss the Indictment, asserting the Agreement as a defense to prosecution.  In compliance with the Third Circuit's directive, this Court held an evidentiary hearing to determine when Stolt-Nielsen "discovered" its anticompetitive conduct, what subsequent actions Stolt-Nielsen and the individual Defendants took, and whether these actions constituted "prompt and effective action to terminate [Stolt-Nielsen's] part in the anticompetitive activity being reported upon discovery of the activity."  Stolt-Nielsen, 442 F.3d at 187 n.7; see also COL ¶¶ 1-3.

## II.      LEGAL STANDARD

While non-prosecution agreements are binding contracts and their interpretation is guided by general principles of contract law, "such agreements are unique and are to be construed in light of 'special due process concerns.'"  United States v. Baird, 218 F.3d 221, 229 (3d Cir. 2000) (citations omitted).  Mindful of the fact that parties who enter into non-prosecution agreements frequently forego valuable constitutional rights, the Court must determine whether the Government's conduct comported with "what was reasonably understood by defendant when entering" the Agreement.  Id.; see also Santobello v. New York, 404 U.S. 257, 262 (1971) ("[A] constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."); United States v. Meyer, 157 F.3d 1067, 1076 (7th Cir. 1998) ("With respect to immunity agreements, due process requires prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves." (citations omitted)).  In addition, the Division drafted the Agreement, and therefore any ambiguity must be resolved in favor of Defendants. See United States v. Gebbie, 294 F.3d 540, 552 (3d Cir. 2002) ("Because of the Government's advantage in bargaining power, we, and numerous other courts of appeals, construe ambiguities in plea agreements against the Government."); see also United States v. Floyd, 428 F.3d 513, 516 (3d Cir. 2005); United States v. Rivera, 357 F.3d 290, 295 (3d Cir. 2004) ("[T]he United States may not rely upon a rigidly literal approach to the construction" of agreements) (citations omitted).

10

The Division bears the burden of demonstrating that Stolt-Nielsen *materially* breached the Agreement.  See United States v. Fitch, 964 F.2d 571, 574-575 (6th Cir. 1992).  The Division urges the Court to apply a "preponderance of the evidence" standard, a standard applied by a number of courts evaluating alleged breaches of plea agreements.  Defendants propose a "clear and convincing" standard of proof.  See United States v. Skalsky, 621 F. Supp. 528, 530 (D.N.J. 1985), aff'd, 857 F.2d 172, 175 (3d Cir. 1988).  The Court's findings of fact and conclusions of law would be unchanged regardless of which of the two standards is applied.

In determining whether a non-prosecution agreement has been breached, the Court must consider whether the non-breaching party received the benefit of the bargain, as well as the incriminating nature of the information provided by the defendant.  See United States v. Castaneda, 162 F.3d 832, 837 (5th Cir. 1998) ("[W]e have recognized that a breach is not material unless the non-breaching party is deprived of the benefit of the bargain."); Fitch, 964 F.2d at 574 (noting that in evaluating the Government's effort to rescind an immunity agreement on the basis of breach of contract, the most important factor is the incriminating nature of the information provided by the defendant) (citing United States v. Johnson, 861 F.2d 510, 513 (8th Cir. 1988)).

## III.    FINDINGS

On January 15, 2003, the Division expressly promised not to prosecute Stolt-Nielsen or its directors, officers and employees "for any act or offense [Defendants] may have committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported."  FOF ¶ 146.  Despite this unambiguous promise drafted by the Division, on

11

March 2, 2004, the Division revoked Stolt-Nielsen's conditional leniency, alleging that the representation in Paragraph 1 of the Agreement that it took "prompt and effective action" to terminate its part in the conspiracy was false.  Although not mentioned in the Agreement, the Division identified March 2002 as the date of "discovery" triggering the company's duty to take prompt and effective action, and alleged that Stolt-Nielsen –  and in particular Wingfield and Jansen –  did not terminate their participation in the customer allocation conspiracy in March 2002, but continued to conspire until November 2002.

The Division contends that because the accuracy of the representation was a "condition precedent" to the Agreement, the entire Agreement is void *ab initio*, and Cooperman and Wingfield, as intended third-party beneficiaries, are without any protection under the Agreement.  See Government's Proposed Conclusions of Law ¶¶ 94-97.[9]  The Division further alleges that providing incomplete or misleading information constituted a breach of Stolt-Nielsen's obligation to provide "full, continuing and complete cooperation."  See Government's Proposed Conclusions of Law ¶¶ 65, 78.  The Court concludes that the Division has not proven that Stolt-Nielsen failed to take prompt and effective action to terminate its part in the conspiracy upon discovery, or that Defendants breached the Agreement in any way.

### A. Discovery

To qualify for immunity under the Agreement, Stolt-Nielsen must have taken prompt and effective action to terminate its part in the conspiracy upon its "discovery."  The term

---

[9]      Cooperman and Wingfield were not separately represented by counsel during the negotiation of the Agreement or when they turned over self-incriminating information pursuant to the Agreement.  FOF ¶ 157.

"discovery" is not defined in the Agreement, nor does the Agreement specify the date upon which Stolt-Nielsen "discovered" the anticompetitive activity it reported.  COL ¶¶ 22-23.  The only date specified in the Agreement is January 15, 2003, and Defendants reasonably understood the Agreement to mean that they would be protected from prosecution for any act or offense committed prior to that date.  COL ¶ 33.[10]

The term "discovery" was defined by the Division in a 1998 Policy Statement as occurring "at the earliest date on which either the board of directors or counsel for the corporation (either inside or outside) were first informed of the conduct at issue."  COL ¶ 22.  In January 2002, O'Brien, who at the time was Senior Vice-President and General Counsel of Stolt-Nielsen, found an April 10, 2001 memorandum from Jansen to Wingfield which had been left anonymously on his desk.  The memorandum analyzed the merits of the customer allocation conspiracy, weighing the advantages and disadvantages of competing with Odfjell.   After reading the memorandum, O'Brien became concerned about antitrust compliance at Stolt-Nielsen, and reported his concerns to Cooperman.  FOF ¶¶ 12-13.  O'Brien's discovery of the memorandum in early 2002 and subsequent reporting of his concerns to Cooperman constituted "discovery" for purposes of the Agreement and triggered Stolt-Nielsen's obligation to take prompt and effective action to terminate its role in the conspiracy.  See COL ¶¶ 25-26.

---

[10]      As the drafter of the Agreement, the Division easily could have specified that all anticompetitive activity must have ceased by March 2002.  Not only was the March 2002 date omitted from the Agreement, no one from Stolt-Nielsen ever represented a specific termination date.  See Nannes GX-6, at 85 ("I didn't represent it [date of termination] because I was not asked.  If I had been asked, I would have said I couldn't represent it."); FOF ¶¶ 117,132.

## B. "Prompt and Effective Action"

The phrase "prompt and effective action" is not defined in the Agreement.  However, by its plain meaning, the phrase, drafted by the Division, requires a prompt and diligent *process*, and does not require immediate termination of all anticompetitive activity.  See COL ¶¶ 19-21.[11]  The evidence presented at the evidentiary hearing persuasively revealed that Stolt-Nielsen took "prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity," and therefore, its representation in Paragraph 1(a) of the Agreement was accurate.  See FOF ¶ 193.  In response to the concerns raised by O'Brien, beginning in late February 2002, Stolt-Nielsen promptly instituted a comprehensive and revised Antitrust Compliance Policy in a genuine effort to eliminate anticompetitive activity at all levels of the company, including senior management.  The action taken effectively terminated Stolt-Nielsen's participation in the customer allocation conspiracy.  See FOF ¶¶ 18-39.

As part of its large-scale effort, Stolt-Nielsen: (1) instituted a comprehensive Antitrust Compliance Policy documented in a revised Antitrust Compliance Handbook; (2) promptly distributed the Handbook to employees and competitors; (3) held a series of mandatory seminars at Stolt-Nielsen's offices around the world, attended by top management, to inform its executives and employees of the necessity of antitrust compliance; (4) required all relevant employees to sign certifications in which they represented that they would comply strictly with all terms of the

---

[11]     Moreover, any contractual ambiguity regarding the obligations imposed by Paragraph 1 of the Agreement must be construed against the Division as the drafter, and must comport with "what was reasonably understood by defendant when entering" the Agreement.  Baird, 218 F.3d at 229.

Antitrust Compliance Policy or risk demotion or termination;[12] and (5) informed its competitors of the revised Policy and the company's intention to comply with it.  At all times, Stolt-Nielsen's management conveyed the unequivocal message that all anticompetitive activity must cease immediately.  See FOF ¶¶ 18-31.

Prior to March 2002, the customer allocation conspiracy required the participation of personnel at various levels within Stolt-Nielsen.  FOF ¶ 36.  The Antitrust Compliance Policy, which Stolt-Nielsen employees described as a "tornado" and a "180-degree turnaround," drastically altered the nature of Stolt-Nielsen's contacts with its competitors.  FOF ¶¶ 32-36. While competitors continued to initiate collusive contacts, Stolt-Nielsen employees repeatedly refused to engage in anticompetitive discussions with them, and reported any such contacts to their superiors.  FOF ¶ 33.  During the evidentiary hearing, two Stolt-Nielsen employees testified that it would have been impossible for anticompetitive contacts to have continued without their knowledge.  See FOF ¶ 36.  Their testimony was corroborated by the expert testimony of Dr. Barry Harris ("Harris"), former Deputy Assistant Attorney General for Economics at the Division.  Harris explained that the revised Antitrust Compliance Policy effectively "severed" the

---

[12]    By July 31, 2002, 134 employees had signed the certifications, representing as follows:

1.    I have received, read and am familiar with the revised edition (Mar.11.02) of the SNTG Antitrust Compliance Handbook.
2.    I attended [one of] the Antitrust Compliance Seminar[s] ...
3.    I will comply with all the terms and provisions of the Antitrust Compliance Policy.
4.    I confirm that I am not aware of any violations of the Antitrust Compliance Handbook existing at this time.
5.    I will promptly report any violations, or attempted violations, of the Policy to SNTG Legal Counsel.

See FOF ¶ 31.

internal company communication pathways– i.e., the links between those who were in contact with competitors and those responsible for bidding – that made it possible for Stolt-Nielsen to implement the customer allocation conspiracy.  See id.

During the March-November 2002 period, Stolt-Nielsen engaged in genuine competition with Odfjell and Jo Tankers, including competition on contracts previously allocated under the conspiracy.  FOF ¶¶ 37-39.  Specifically, the three contracts identified by the Division as examples of continued collusion – Sasol, Pecten, and SK – were actually examples of fierce competition.  See FOF ¶¶ 66-102.  In the Summer and Fall of 2002, Stolt-Nielsen, with the support of Wingfield and other members of senior management, competed vigorously for the business of Sasol, a customer previously allocated to Odfjell.  In an effort to gain a competitive advantage over Odfjell, and with the support of management including Wingfield, Stolt-Nielsen entered into a joint venture with a company called Southern Tankers as part of the South African Government's "black-empowerment initiative," a program designed to engage the country's black population in economic development.  Stolt-Nielsen submitted a highly competitive initial bid to Sasol on September 16, 2002, followed by a highly competitive final bid on October 11, 2002.  See FOF ¶¶ 66-71.[13]

---

[13]     On September 30, 2002, Lee sent an email message to Niels Stolt-Nielsen, CEO of SNSA reporting about Stolt-Nielsen's prospects of winning the Sasol contract as a result of the black empowerment initiative.  On October 1, 2002, Niels Stolt-Nielsen replied, congratulating Lee and Cooperman on their "creative thinking."  Lee forwarded the message to Wingfield, who replied "thank you!! Let's hope it works."  Niels Stolt-Nielsen then inquired: "which contracts will [Odfjell] retaliate on?" to which Wingfield responded: "good question and the truthful answer is [I] don't know ... what we will say publicly (and [Odfjell] will pick up on this) is that this is regional business and not part of main fleet business - not really true but hopefully we can avoid a war in the near term."  Despite the Division's effort to characterize the exchange as furthering a collusive purpose, the discussion, which reveals a sincere will to win the Sasol contract and a concern about "retaliation," manifests a genuine commitment to competition on the Sasol contract, accompanied by a desire to avoid a full-fledged war with Odfjell – a

Upon learning about Stolt-Nielsen's competitive bid to Sasol, Odfjell executives called Wingfield repeatedly to complain and demand that the bid be withdrawn.  Despite Odfjell's repeated protests and demands, Wingfield refused to withdraw Stolt-Nielsen's bid for the Sasol contract, as confirmed by his contemporaneous journal entries.  See FOF ¶¶ 72-76.  The Division alleges that in spite of his vigorous efforts to win the Sasol business, Wingfield ultimately revealed Stolt-Nielsen's bid rates to Odfjell, enabling it to retain the contract.  The only support for this allegation was the discredited testimony of Odfjell witnesses Nilsen and Haugsdal, whose account of the alleged rig was fraught with contradiction, and is uncorroborated by documentary evidence or credible testimony.  See Section III-D ("Credibility"), *infra*.  Indeed, the evidence reveals that Stolt-Nielsen competed aggressively for the Sasol contract, but that Odfjell, the incumbent, received a "last look" from Sasol, enabling it to reduce its rates in response to the information it received.  Odfjell's contemporaneous internal bid analyses reveal that Odfjell decreased its initial bid by over 7 percent, and not by "2 to 3 percent" as Haugsdal testified, discrediting the allegation that Wingfield somehow rigged the bid.  See FOF ¶¶ 78-80.

The Division further alleges that in November 2002, Wingfield and Van Westenbrugge of Jo Tankers entered into a *quid pro quo* arrangement whereby Stolt-Nielsen would refrain from bidding on the "large" Pecten contract, and in return, Jo Tankers would not pursue the SK contract.[14]  The Division's contention was refuted not only by Stolt-Nielsen's witnesses, but by

---

lawful objective.  FOF ¶ 71.

[14]      In the Fall of 2002, two Pecten contracts were on the market: the "large" Pecten contract from the U.S. Gulf to a number of ports in the Far East, and a smaller contract from the U.S. Gulf to two ports in China.  While Jo Tankers was competing for the large Pecten contract, Stolt-Nielsen was competing for the smaller contract.  See FOF ¶ 95.

Van Westenbrugge himself, who denied the existence of any *quid pro quo*, and testified that Jo Tankers decided not to bid for the SK contract for independent business reasons.  FOF ¶¶ 100-101.

Finally, the Division alleges that Stolt-Nielsen and Odfjell colluded on the SK contract, and that Wingfield contacted Nilsen to demand that Odfjell refrain from competing.  The only evidence offered by the Division in support of its claim was the testimony of Nilsen, who could not recall the rates discussed during the alleged phone call, but testified that as a result of the call, Odfjell's bid was $2 or $3 higher than Stolt-Nielsen's targeted rate.  In fact, as contemporaneous documents confirmed, Odfjell *competed* for the SK contract, bidding within fifty cents of Stolt-Nielsen's targeted bid.  The evidence revealed that on November 18, 2002, SK's broker gave Stolt-Nielsen, the incumbent, a "last look."  Wayne Harrison, Business Director for Home Bound Return, who had final authority to determine the bidding rates, was led to believe that Odfjell's bid was substantially lower than it turned out to be, and in response to competition from a number of carriers, he and his bid team sharply reduced Stolt-Nielsen's rates and made other valuable concessions, thus retaining the contract.  See FOF ¶¶ 81-92.

Evidence of genuine competition on the Sasol, Pecten and SK contracts was corroborated by the testimony of Wingfield, who denied any collusion; Jansen, who testified that he was unaware of any collusion on these contracts; and members of the Stolt-Nielsen bid teams, who testified as to the aggressive nature of the bids.  Fierce competition on these and various other contracts in the March-November 2002 period is illustrative of the effectiveness of the Antitrust Compliance Policy in transforming Stolt-Nielsen's business practices, and fully consistent with Stolt-Nielsen's representation that it took prompt and effective action to terminate its part in the

customer allocation conspiracy.[15]

The Division's allegations that Wingfield's meetings with Odfjell and Jo Tankers representatives in March, June, and October 2002 were conspiratorial in nature did not withstand evidentiary scrutiny.  Both testimony and documentary evidence confirmed that each meeting was convened for a lawful purpose:  (1) during the National Petroleum Refiners Association ("NPRA") conference, Wingfield met with Odfjell and Jo Tankers in order to inform them about Stolt-Nielsen's Antitrust Compliance Policy and the company's intent to strictly enforce it, see FOF ¶¶ 43-45, 49-51; (2) the June 2002 meeting at Luigi's was called for the purpose of formalizing a lawful sublet arrangement between Stolt-Nielsen and Odfjell on the Brazil-Africa-Japan ("BAJ") trade lane, see FOF ¶¶ 56-57; and (3) the October 2002 meeting at Heathrow was held for the purpose of discussing complaints by a Stolt-Nielsen customer, Dow Chemical, regarding operational issues on the BAJ sublets.  See FOF ¶¶ 61-63.  Each meeting took place with the full knowledge of Stolt-Nielsen's senior management, and adhered to the requirements of the Antitrust Compliance Policy, which permitted discussion with competitors on lawful topics.  See FOF ¶¶ 54, 58, 63; COL ¶ 41.

### C.  The Individual Defendants

On January 15, 2003, Wingfield and Cooperman were "directors and/or officers" of Stolt-Nielsen, and therefore were intended third-party beneficiaries of the Agreement.  Paragraph 4 of the Agreement provides that subject to Stolt-Nielsen's "full, continuing and complete

---

[15]    Post-March 2002 efforts by Odfjell and Jo Tankers to continue anticompetitive activity, without collaboration from Stolt-Nielsen, do not amount to a breach of the Agreement by Stolt-Nielsen. See United States v. Andreas, 216 F.3d 645, 669 (7th Cir. 2000); COL ¶ 40.

cooperation," Stolt Nielsen's directors, officers and employees will not be prosecuted for their

participation in the conspiracy prior to January 15, 2003 if they fulfill individual cooperation

obligations.  FOF ¶ 151.  While the Agreement required Stolt-Nielsen to certify that it took

"prompt and effective action" to terminate its part in the customer allocation conspiracy,

Wingfield and Cooperman were not required to make such a representation.  COL ¶ 34.  Neither

individual defendant was represented separately by counsel, and each reasonably understood the

Agreement to mean that if he cooperated with the Division, he would be immune from

prosecution for any antitrust violations committed before January 15, 2003.  See FOF ¶ 157;

COL ¶ 33.[16]

     The Division argues that Cooperman is not entitled to immunity because: (1) he failed to

conduct an independent investigation and report the conspiracy to the Division upon O'Brien's

discovery; (2) he "knew or was willfully ignorant that Wingfield continued to conspire" after

March 2002 and yet failed to restrain him; and (3) he misled the SNSA Board by discounting

O'Brien's allegations regarding illegal activity.   See Government's Proposed Conclusions of

Law ¶¶ 103-106.

     It is well-settled that as a matter of fundamental fairness, the Division may not seek to

revoke the Agreement on the basis of facts known to it at the time it entered into the Agreement.

See United States v. Roe, 445 F.3d 202, 207-08 (2d Cir. 2006) ("We have made clear, however,

that the government may not base its dissatisfaction with a defendant's performance of an

agreement on facts known to the government at the time the agreement is executed.  Not only

---

[16]     The Division makes no allegation of any antitrust violations after January 15, 2003.  See
FOF ¶ 191.

would it be unfair for the government to rely upon ... known, pre-agreement circumstances ... it would have been fraudulent to have induced a defendant's plea with a promise that the government already knew it was not going to keep." (citations omitted)); United States v. Knights, 968 F.2d 1483, 1488 (2d Cir. 1992). Yet, the Division seeks to revoke Cooperman's immunity on the basis of facts known to it at the time the Agreement was signed.

When the Division accepted Stolt-Nielsen into the Corporate Leniency Program, it was aware that Stolt-Nielsen and Cooperman had not conducted an independent investigation in early 2002, had not reported past antitrust violations in early 2002, and had been accused publicly of ongoing antitrust violations as recently as November 2002. See FOF ¶ 161.[17] Contrary to the Division's allegations, each Stolt-Nielsen employee who testified – including Government witness Jansen – stated that in late February and early March of 2002, Cooperman led the campaign to terminate Stolt-Nielsen's participation in the customer allocation conspiracy, and that he unequivocally instructed that all anticompetitive activity must cease immediately. FOF ¶¶ 22, 27. There is simply no evidence that Cooperman was aware of or engaged in any illegal conduct after March 2002. FOF ¶ 196.[18] In the absence of such evidence, the Division's effort to

---

[17]     The notion that Cooperman misled the board by concealing information about the conspiracy is unsupported by the record. See FOF ¶¶ 16-17. Cooperman's report to the SNSA Board in August 2002 was focused on "ongoing antitrust violations," and as Government witness Richard Fisher acknowledged, Cooperman gave an "earnest report" on ongoing activity from early 2002. See FOF ¶ 17.

[18]     For example, in its summation, the Division was unable to identify any evidence that Cooperman was aware of or engaged in any illegal activity after March 2002:

> THE COURT:          Well, let me just -- again, I want to be sure I understand. You have no evidence of any wrongdoing by Mr. Cooperman, is that right, personally?
> [...]

criminally prosecute Cooperman is fundamentally unfair.

The Division further argues that Wingfield is not entitled to immunity because he independently breached the Agreement "by providing false information that Stolt-Nielsen withdrew from the conspiracy in March 2002," withheld "evidence of his conspiratorial activities after March 2002," and "failed to inform the Government when he learned Jansen had lied" about when Stolt-Nielsen withdrew from the conspiracy.  See Government's Post-Hearing Brief, at 59-60.  The Division's argument is without merit for a number of reasons: first, at no time did Stolt-Nielsen represent that it terminated its anticompetitive conduct in March 2002.  The Agreement was devoid of any mention of the March 2002 date, and Nannes testified that he never made such a representation to the Division, nor was he asked to do so.  See FOF ¶¶ 117, 132.[19]

Second, the Division has failed to prove that either Wingfield or Cooperman participated in any wrongdoing in the March-November 2002 period or withheld any information from the Division.  Wingfield has denied any such wrongdoing, and his testimony was corroborated by ample credible evidence demonstrating that Stolt-Nielsen's management genuinely was committed to the Antitrust Compliance Policy and its enforcement, and took prompt and effective action to terminate its part in the customer allocation conspiracy, as it truthfully

---

       THE DIVISION:      [W]e don't have anyone who said that he knew the conspiracy was continuing.

Division Summation 6/21/07, at 253.

[19]     Paragraph 5 of the Agreement contains an integration clause stating that "[t]his letter constitutes the entire agreement between the Antitrust Division and [Stolt-Nielsen], and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein." FOF ¶ 147.

represented in the Agreement.  See FOF ¶¶ 18-3.

Finally, there is no evidence whatsoever that either Wingfield or Cooperman failed to

fulfill his personal obligations under the Agreement.  Their obligations, as set forth in Paragraph

4 of the Agreement, applied prospectively from January 15, 2003, the date of the Agreement, and

thus had nothing to do with the events of March-November 2002.  FOF ¶ 152.[20]  Inexplicably, the

Division made no effort to speak either to Wingfield or to Cooperman, or to afford either of them

an opportunity to respond to the Division's allegations, although each was at all times available

to cooperate.[21]  FOF ¶ 177, 183; COL ¶ 37.  Indeed, Wingfield's cooperation was instrumental to

the Division, as he was the one who, in response to Nannes' request, uncovered the 1998

"combined list"– the "smoking gun" used by the Division to secure multiple convictions and

fines.  FOF ¶ 128, 176.  With this and other incriminating evidence provided by Stolt-Nielsen

and its employees, the Division secured guilty pleas from Stolt-Nielsen's co-conspirators in the

customer-allocation conspiracy.  Odfjell was fined $42.5 million.  Its CEO, Sjaastad, was

sentenced to four months in prison and fined $250,000, and its Vice-President, Nilsen, was

sentenced to three months in prison and fined $25,000.  Jo Tankers was fined $19.5 million, and

---

[20]     On April 8, 2003, the Division suspended Stolt-Nielsen's obligation to cooperate under
the Agreement.  FOF ¶ 177.

[21]     "The Antitrust Division did not advise counsel for [Stolt-Nielsen] or Wingfield
personally that [Stolt-Nielsen] employees were obligated to appear for interviews with the Antitrust
Division, or otherwise provide information to the Antitrust Division without being asked or subpoenaed."
See 6/19/07 Stipulation, Docket No. 269 (emphasis added); FOF ¶ 153.

"The Antitrust Division did not advise counsel for [Stolt-Nielsen] or Cooperman
personally that [Stolt-Nielsen] employees were obligated to appear for interviews with the Antitrust
Division, or otherwise provide information to the Antitrust Division without being asked or subpoenaed."
See 6/18/07 Stipulation, Docket No. 268 (emphasis added); FOF ¶ 153.

its former co-managing director, Van Westenbrugge, was sentenced to three months in prison and fined $75,000.  See FOF ¶¶ 173-175.

### D. Credibility

In assessing the credibility of a witness, "the trier of ... fact may consider the witness' demeanor and manner while on the stand, the character of his testimony as being probable or improbable, inconsistencies, patent omissions and discrepancies in his testimony, or between the testimony of different witnesses, contradictory testimony, his interest in the outcome of the case, his relationship to the litigants, and many other factors bearing upon the truthfulness or untruthfulness of the witness' testimony."  Young Ah Chor v. Dulles, 270 F.2d 338, 341 (9th Cir. 1959); see also United States v. Isaac, 134 F.3d 199, 204 (3d Cir. 1998) ("We recognize that a witness who has been given a reward for cooperation has also been given an incentive to shade the truth or to lie."); United States v. Sarivola, 1994 WL 613259, at *2 (S.D.N.Y. Nov. 4, 1994) (observing that factors to be weighed in assessing credibility include "a motive to shade the truth; whether the accounts given are inherently plausible or implausible; whether those accounts are corroborated or contradicted by independent evidence; the demeanor of the witnesses as they testified; and any other factors that might bear on credibility").

The Division has failed to produce any credible evidence that Stolt-Nielsen's participation in the customer allocation conspiracy continued past March 2002.  Nor has the Division proposed a conceivable personal motive for the misconduct it alleges, as there is no indication that either Cooperman or Wingfield stood to profit in any way from continued anticompetitive activity.  FOF ¶ 192.  Indeed, it would defy logic for executives such as

Wingfield and Cooperman to risk their careers to continue a criminal conspiracy that had been exposed publicly and repudiated by their company's revised Antitrust Compliance Policy.  With the exception of Jansen, who the Division ultimately attempted to treat as a hostile witness, the only testimony adduced in favor of the Division's version of the events of March-November 2002 was the testimony of a Jo Tankers employee and a number of Odfjell employees whose accounts were fraught with contradiction and uncorroborated by documentary evidence.  Each Odfjell and Jo Tankers witness testified in return for individual or corporate cooperation agreements that promised immunity or a reduced sentence in exchange for testimony against Defendants.  Each witness thus had a strong motive to seek leniency from the Division and to retaliate against a competitor that had implicated him in a criminal conspiracy.  See FOF ¶¶ 189-190.

## 1.    Finlay

When the Division issued its April 8, 2003 letter suspending Stolt-Nielsen's cooperation obligations, the *only* co-conspirator with whom it had spoken was Hugo Finlay ("Finlay") of Jo Tankers, who testified that the customer allocation conspiracy continued past March 2002.  See FOF ¶ 178.   In exchange for his assistance and testimony against Defendants, the Division entered into an individual immunity agreement with Finlay.  The agreement enabled him to avoid both incarceration and criminal fines.  See FOF ¶ 179.  His superior, Van Westenbrugge, testified that he believed Finlay would "say whatever he needed to get his own release, his own immunity."  Van Westenbrugge 6/14/07, at 221-24.

During the evidentiary hearing, Finlay was impeached repeatedly with prior inconsistent

sworn testimony.  For example, in a prior deposition, Finlay denied knowledge of a customer

allocation conspiracy in the parcel tanker shipping industry in the 1998-2002 period despite the

fact that he had actively participated in it.  See Finlay 6/14/07, at 106-09, 121.[22]  Finlay's

testimony that the March 2002 dinner meeting at the NPRA conference with Van Westenbrugge,

Wingfield, Jansen, and Cleary was conspiratorial in nature is refuted by the fact that, as

Wingfield, Cleary, and Van Westenbrugge testified, Finlay and Cleary were asked to leave the

table prior to any discussion of antitrust compliance issues.  Thus, Finlay had no personal

knowledge of the private discussion between Wingfield and Van Westenbrugge.  See FOF ¶¶ 51-

52.  Nor did Finlay have *any* collusive contacts with anyone at Stolt-Nielsen after March 2002.

See Finlay 6/14/07, at 114-15.

　　　While Finlay testified at the hearing that Stolt-Nielsen had requested that Jo Tankers

refrain from competing for the SK contract in exchange for Stolt-Nielsen's bidding high on the

Pecten contract, he conceded on cross-examination that he had no personal knowledge of such a

*quid pro quo*.  See Finlay 6/14/07, at 153-54.  Finlay's testimony was contradicted not only by

---

[22]　　Q. [I]n paragraph 4(b), on that same page, [it] says that "The defendant," that's Jo
　　　　Tankers B.V., "through its agents, officers, and employees participated in the conspiracy
　　　　among major providers of parcel tanker shipping, the substantial terms of which were to
　　　　allocate customers, rig bids, and fixed [sic] prices for Contracts of Affreightment for
　　　　parcel tanker shipping of products to and from the United States and elsewhere." Do you
　　　　see that, sir?
　　　　A. Yes.
　　　　Q. Is that statement true, to your knowledge?
　　　　A. I can only answer for myself, and it certainly didn't apply to anything that I did.
　　　　Q. You're not aware of any conspiracy during that period among the major providers of
　　　　parcel tanker shipping to allocate customers?
　　　　A. No.
　　　　Q. Excuse me?
　　　　A. No, I'm not.

Finlay 6/14/07, at 121 (video testimony) (emphasis added).

Wingfield, Cleary, and Jansen, but also by his superior Van Westenbrugge, who denied the existence of a *quid pro quo*.  See Van Westenbrugge 6/14/07, at 202-203, 222.

## 2.    Haugsdal

Jarle Haugsdal ("Haugsdal"), who in 2002 held the position of Senior Vice President of Chartering and Operations at Odfjell, testified pursuant to the plea agreement between the Division and Odfjell.  See Haugsdal 6/12/07, at 83, 154-55.  He provided repeated false accounts of Odfjell's involvement in the customer allocation conspiracy: on January 17, 2003, Haugsdal sent an email to Odfjell employees falsely stating "we are of the firm opinion that we in our business dealings have always acted well within the relevant competition laws."  DX-1353. Immediately following the European dawn raids of February 2003, Haugsdal was responsible for a press release falsely stating: "We have no knowledge of any unlawful conduct, and we have initiated our own internal investigation."  Haugsdal 6/12/07, at 130-31.[23]  On February 20, 2003, the *Wall Street Journal* quoted Haugsdal's statement that "we in our business dealings have always acted well within the relevant competition laws."  FOF ¶ 42.

Haugsdal's testimony that the Sasol contract was subject to collusion was contradicted both by testimony and contemporaneous documentary evidence.  He misrepresented having personal knowledge of the details of the transaction, as evidenced by his inability to recall anything about the figures he testified he was given by Wingfield.  See Haugsdal 6/12/07, at 110. Moreover, he admitted on cross-examination that his testimony regarding Odfjell's alleged 2-3 percent reduction in the Sasol bid was based on information provided by Odfjell's Knut Holsen,

---

[23]    On February 19, 2003, the European Commission conducted dawn raids seeking evidence of antitrust violations at the offices of Odfjell.  FOF ¶ 170.

whom the Division did not call as a witness.  Haugsdal's ignorance of the Sasol transaction was

evidenced by the fact that Odfjell decreased its initial bid by over 7 percent, and not by "2 to 3

percent" as he testified.  See FOF ¶ 80.  It was contradicted further by extensive documentary

evidence of vigorous competition on the Sasol contract, including evidence that Sasol gave

Odfjell a "last look," and that Odfjell reduced its rates significantly in response to the

information it received from Sasol.  See FOF ¶ 78.

Haugsdal's sworn grand jury declaration also was replete with material misstatements of

fact.  When confronted with the inconsistencies, Haugsdal was uncertain how or by whom his

declaration was prepared.  Haugsdal 6/12/07, at 246 ("Q. Who wrote the draft declaration? A.

Must be my lawyers. Q. Could it have been the government lawyers, too? A. I have no clue.").  In

return for his cooperation, Haugsdal successfully avoided prosecution although his superior,

Sjaastad, and subordinate, Nilsen, both served prison terms.

**3.      Nystad**

In 2002, Morten Nystad ("Nystad") was Odfjell's Vice President for Americas.  He

provided testimony pursuant to Odfjell's plea agreement with the Division.  See Nystad 6/11/07,

at 110-11, 170-71.  In exchange for his cooperation, the Division agreed not to prosecute Nystad.

See Nystad 6/11/07, at 170-71.  In direct conflict with the testimony of both Sjaastad and

Wingfield, Nystad, who attended the March 2002 NPRA meeting with Sjaastad and Wingfield,

testified that he could not recall Wingfield discussing Stolt-Nielsen's Antitrust Compliance

Policy and his intent to comply with it.  Nystad 6/11/07, at 182.  Nystad's credibility was

diminished further by the uncontested fact that promptly after the meeting, Wingfield sent an

email to Sjaastad forwarding Stolt-Nielsen's Antitrust Compliance Handbook and specifically referencing their discussion at the NPRA meeting.  FOF ¶ 46.  Nystad's failed recollection on such a central matter stands in sharp contrast to his allegedly clear recollection of Wingfield making the exact statements "business as usual" and "status quo would prevail." Wingfield expressly denied making these statements.  See FOF ¶ 48.

**4.      Nilsen**

Nilsen testified pursuant to the plea agreement he entered into with the Division in September 2003.  FOF ¶ 190.  In exchange for his cooperation, the Division agreed to seek a reduced sentence, and Nilsen served a three-month prison term, paid a $25,000 fine, and received an immigration waiver allowing him to continue to travel to and from the United States.  See GX-18C, Nilsen 6/15/07, at 161, 165-66.  The immigration waiver was a critical component of Nilsen's plea bargain, and enabled him to continue his career, which required travel to and from the United States.  Nilsen 6/15/07, at 166.

In 2002, Nilsen was Odfjell's Vice President for Asia-Pacific and for Clean Petroleum Products, and a key participant in the customer allocation conspiracy.  Nilsen 6/15/07, at 119-120.  Notably, Nilsen testified on direct examination that he spoke "the truth from day one, from A to Z" about his involvement in the conspiracy.  Id. at 119.  However, on cross-examination Nilsen conceded that he lied to the *Wall Street Journal* and Odfjell's customers when he denied any wrongdoing and declared, "We are honest. We live by the law."  See Nilsen 6/19/07, at 180.

On direct examination, Nilsen testified that Stolt-Nielsen continued to participate in the conspiracy after March 2002.  Nilsen 6/15/07, at 124.  However, when confronted with examples

29

of vigorous post-March 2002 competition, Nielsen conceded that it was not "business as usual," and repeatedly disavowed familiarity with the business.  See Nilsen 6/19/07, at 133, 46 ("I was not involved at all, so I am not familiar at all with these matters"); Nilsen 6/19/07, 50 ("I did not know the trade.  I have no clue ... I have no knowledge about this trade and the various contracts whatsoever.").

In addition, Nilsen's characterization of the June 13, 2002 Luigi's dinner as collusive was contradicted by his declaration to the Korean Fair Trade Commission ("KFTC"), in which he described the meeting as "purely social."  Nilsen 6/19/07, at 29-30; DX-524, at OD0094665.  This description was consistent with Odfjell's submission to the KFTC, which stated that the Odfjell employees "[c]annot remember that any improper issues were discussed in London (looking at it retroactively)."  DX-508, at 9; FOF ¶ 94.

Nilsen's testimony that on October 11, 2002, Wingfield called to give Stolt-Nielsen's Sasol bidding rates to Odfjell was not credible, as his account of who at Odfjell received the rates was ever-changing.  His draft grand jury declaration stated that Wingfield "disclosed Stolt-Nielsen's prices to *me*."  DX-4169, at ¶ 10 (emphasis added).  His signed grand jury declaration dated May 13, 2004, however, states that Wingfield "disclosed SNTG's prices to *us*."  DX-4114, at ¶ 10 (emphasis added); Nilsen 6/15/07, at 200.  At the hearing, Nilsen stated that Wingfield called *Haugsdal*, and that he was not present at the time.  Nilsen 6/15/07, at 147.  When asked about the inconsistencies, Nilsen replied, "I cannot explain that properly.  I don't know."  Nilsen 6/15/07, at 201.

**5.      Sjaastad**

_____Sjaastad testified pursuant to his September 25, 2003 plea agreement with the Division.
See GX-18B.  In exchange for his cooperation, Sjaastad served a reduced sentence of four
months imprisonment and paid a fine of $250,000.  See Sjaastad 6/20/07, at 92-93, 141.  In 2002,
Sjaastad was president and CEO of Odfjell ASA and actively participated in the customer
allocation conspiracy.  Sjaastad 6/20/07, at 105.  Sjaastad incredibly testified at the evidentiary
hearing that he was not aware that his conduct was illegal until he read the February 2003 *Wall
Street Journal* article reporting on antitrust violations in the parcel-tanker industry.  See Sjaastad
6/20/07, at 172.  This testimony was unbelievable for a number of reasons: (1) in 2001, Sjaastad
drafted a memorandum for Odfjell's board of directors, which stated that agreements that restrain
competition are illegal, Sjaastad 6/20/07, at 153-55; (2) in March 2002, he authorized a $50,000
payment to Trond Storli, an Odfjell employee, to ensure that he did not reveal Odfjell's
involvement in antitrust violations, see FOF ¶ 40; and (3) he testified that at the March 2002
NPRA meeting, Wingfield informed him that in response to O'Brien's concerns about antitrust
violations, Stolt-Nielsen had issued a revised Antitrust Compliance Policy.  See Sjaastad 6/20/07,
at 111-15.

With respect to the October 2002 Sasol bid, Sjaastad testified that at the request of Nilsen
and Haugsdal, he unsuccessfully attempted to contact Stolt-Nielsen to complain about its
competitive bid and demand its withdrawal.  See Sjaastad 6/20/07, at 122-23.  However, despite
his involvement, Sjaastad admitted that when he was interviewed by the Division in July 2003
about the Sasol bid, he said *nothing* about Wingfield providing bid numbers to his colleagues at
Odfjell.  See Sjaastad  6/20/07, at 123-26.

**6.      Jansen and Van Westenbrugge**

In exchange for his cooperation and testimony against Stolt-Nielsen, Jansen was awarded an individual immunity agreement by the Division and was able to avoid prosecution.  Jansen 6/13/07, at 86; DX-6.  During his initial interview with the Division on February 5, 2003, Jansen represented that the conspiracy ended in March 2002.  After the Division suspended Stolt-Nielsen's cooperation obligations, and after the Division threatened to revoke Jansen's personal immunity, he was again interviewed, at which time he recanted his earlier statements and claimed that the conspiracy continued after March 2002.  See FOF ¶ 165.  Despite the Division's representations, Jansen denied any knowledge of any collusive conduct as to the three contracts – SK, Pecten and Sasol – which the Division alleged were subject to collusion.  The Division ultimately attempted to treat him as a hostile witness.  Jansen 6/13/07, at 139, 265-66.

Moreover, the testimony of Van Westenbrugge, a Government witness, did not support the Division's theory that collusive discussions continued after March 2002.  See Van Westenbrugge, 6/14/07, at 226, 232-33.  Van Westenbrugge acknowledged that Wingfield informed him about the revised Antitrust Compliance Policy, and addressed his concerns about continued cooperation on a *lawful* co-share agreement between Stolt-Nielsen and Jo Tankers. Van Westenbrugge, 6/14/07, at 182-84, 226, 232-33.  With respect to the Division's allegation that Wingfield and Van Westenbrugge had entered into a *quid pro quo* agreement on the SK and Pecten contracts, Van Westenbrugge, the only witness with personal knowledge of the alleged communication with Wingfield, expressly denied the existence of a *quid pro quo* arrangement and testified that his decision not to pursue the SK contract was for independent business reasons.  See Van Westenbrugge 6/14/07, at 203, 221-22, 231-34 ("[T]he two events are

completely separate."); FOF ¶ 100.  The Division then attempted to impeach its own witness.

See Van Westenbrugge 6/14/07, at 203-08.[24]  Such testimony is particularly noteworthy because,

even though he served a prison term due to Stolt-Nielsen's cooperation with the Division, Van

Westenbrugge corroborated Wingfield's testimony, as well as the independent evidence of

genuine competition in the post-March 2002 period.

## IV.    CONCLUSION

When Stolt-Nielsen approached the Division in November 2002 to report its antitrust

violations, the Division did not have sufficient evidence to sustain a conviction of any company

in the parcel tanker industry.  Using highly incriminating evidence produced by Stolt-Nielsen and

its employees, including the "combined lists" provided by Wingfield, the Division obtained the

benefit of its bargain – it successfully dismantled the cartel and secured guilty pleas from Stolt-

Nielsen's co-conspirators which included prison terms and fines totaling $62 million.

Defendants, however, have not been afforded the benefit of their bargain.  On April 8, 2003, after

accepting volumes of incriminating evidence from Defendants, the Division suspended Stolt-

Nielsen's cooperation obligations solely on the discredited word of Finlay.  Without ever

speaking either to Wingfield or Cooperman, whose cooperation obligations under the Agreement

were prospective from January 15, 2003, or providing either of them the opportunity to respond

to Finlay's allegations, the Division revoked Defendants' immunity.  It then proceeded to solicit

the cooperation of the very co-conspirators whom Defendants had reported to the Division in

reliance on its promise of immunity, and used the co-conspirators' testimony to prosecute

---

[24]     The Division urges the Court not to credit the testimony of Van Westenbrugge, arguing
that he was attempting "to minimize his own criminal conduct."  Government's Proposed Findings of
Fact ¶ 290.

Defendants.  Not only was the Division's conduct inconsistent with "what was reasonably understood" by the Defendants when they entered into the Agreement, Baird, 218 F.3d at 229, it was fundamentally unfair.  See Castaneda, 162 F.3d at 839-40.[25]

The Court has considered the Agreement "anew" and concludes that: (1) Stolt-Nielsen took "prompt and effective action" to terminate its part in the customer allocation conspiracy upon O'Brien's discovery of the conspiracy; (2) there is no credible evidence that Stolt-Nielsen's participation in the customer allocation conspiracy continued past March 2002; and (3) there is no evidence that any of the defendants breached the Agreement by failing to cooperate.  Indeed, neither Cooperman nor Wingfield ever was asked by the Division to do anything that he refused to do.  Since the Division had no reasonable basis upon which to revoke the Agreement, and because fundamental fairness demands it, the Indictment will be dismissed.   An appropriate Order follows.

---

[25]    It ill behooves government agents and prosecutors to enter into agreements of transactional immunity with mid-level co-conspirators, milk them of substantial leads and information that literally make the government's case ... then, at the last moment, rely on some technical or relatively minor deficiency in performance to pull the rug from under the cooperating informant by claiming a breach and proceed to prosecute him in a slam-dunk case based largely on his own revelations. Yet, this is precisely what we perceive to have happened here, and due process cannot abide such behavior ...
    Castaneda, 162 F.3d at 839-40.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 06-cr-466** |
| | : | |
| **STOLT-NIELSEN S.A., <u>et al.</u>** | : | |


## <u>ORDER</u>

**AND NOW**, this   29th        day of November, 2007, upon consideration of

Defendants' Motions to Dismiss the Indictment (docket nos. 89, 90, 91) and all responses

thereto, after an evidentiary hearing, and for the reasons stated in the accompanying

Memorandum, Findings of Fact and Conclusions of Law, it is **ORDERED** that the Indictment is

**DISMISSED**.



                                                    **BY THE COURT:**



                                                    **/s/ Bruce W. Kauffman**
                                                    **BRUCE W. KAUFFMAN, J.**